1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON GITTHENS, | Case No.  1:12-cv-1997-SKO |
| Plaintiff, | **ORDER ON PLAINTIFF'S COMPLAINT** |
| v. | (Docket No. 1) |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

_____/

## INTRODUCTION

Plaintiff Sharon Gitthens ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 9.)

1

**BACKGROUND**

2      Plaintiff was born in 1948, and has a bachelor's degree in sociology.  (AR 16, 23, 35.)  She

3 worked for nearly 19 years as a family service specialist and employment training specialist.

4 (AR 36, 134.)

5 **A.      Relevant Medical History**

6      In 2005, Plaintiff was diagnosed with fibromyalgia.  (AR 208.)  Treatment notes also

7 indicate that Plaintiff was diagnosed with mild degenerative disc disease at L4-L5, and

8 degenerative facet hypertrophy at L2-S1, L4-L5, and at L3-L4.  (AR 208.)  A magnetic resonance

9 imaging scan ("MRI") of Plaintiff's lumbar spine showed a "disk/osteophyte complex and a

10 posterior element hypertrophy resulting in severe narrowing of the left L3-L4 neural foramen" as

11 well as mild to moderate spinal canal stenosis, mild degenerative disc disease at L4-L5, and

12 degenerative facet hypertrophy at L5-S1, L4-L5, and L3-L4.  (AR 208.)

13      On January 20, 2006, Plaintiff was admitted to the hospital for treatment of a heart attack.

14 (AR 209.)  She underwent an angioplasty with two stents (AR 39), and did not return to work

15 following her heart attack (AR 40).

16      On March 1, 2006, Plaintiff was seen by Andrew Finlay, M.D., who noted that Plaintiff

17 complained of pain in her neck and lower back and pain from fibromyalgia in her right wrist.

18 (AR 210.)  Dr. Finlay recommended heat, massage, stretching, a home exercise program, and

19 acupuncture.  (AR 211.)  Dr. Finlay also indicated that Plaintiff was to use a lateral epicondylitis

20 band from a sporting-goods store.  (AR 211.)  At a follow-up appointment on April 10, 2006,

21 Plaintiff reported the same symptoms, but the treatment note indicates that Plaintiff was

22 experiencing no wrist pain.  (AR 214.)  Dr. Finlay referred Plaintiff for a second epidural shot.

23 (AR 214.)  On June 14, 2006, Plaintiff reported to Dr. Finlay that the first epidural had not helped;

24 her pain was improved for a couple days, but then returned to the same levels.  (AR 215.)  Further,

25 her cardiologist had not permitted her to have the second epidural for which Dr. Finlay had

26 referred her.  (AR 215.) Plaintiff also noted wrist pain that would worsen with motion.  (AR 215.)

27      On August 14, 2006, Plaintiff again reported neck, lower back, and wrist pain as well as

28 thigh pain.  (AR 218.)  She indicated she was sleeping poorly due to the pain, and she was

experiencing anxiety.   (AR 218.)   On September 27, 2006, Plaintiff reported the same symptomatology at a follow-up visit.  (AR 220-21.)  Plaintiff was prescribed narcotic medication for pain because Dr. Finlay indicated that other medications had not been successful.  (AR 223.) On December 20, 2006, Dr. Finlay prescribed up to 9 Norco tablets per day for pain.  (AR 226.)

On January 14, 2007, Plaintiff was examined by Sun Hansrote, M.D., a neurologist.  She presented for evaluation of a stroke.  (AR 227.)  Plaintiff indicated that she suffered a heart attack in the prior year, she was on Norco for pain and usually took 3 to 4 per day, but sometimes took up to 9 per day.  (AR 227.)  Dr. Hansrote reported that Plaintiff "certainly has risk factors for CVA's – genetic predisposition, [hypertension], hyperchol, CAD, and smoking – [h]owever, she does not have any focal neuro deficit suggestive of a stroke."  (AR 228.)  Dr. Hansrote indicated that Plaintiff's diffuse symptoms were likely from the narcotic influence and counseled Plaintiff to continue her medication and to stop smoking.  (AR 228.)  A head computed tomography ("CT") was ordered, which was completed on January 22, 2007; the results were negative and did not indicate a stroke.  (AR 274-75.)

On January 25, 2007, Plaintiff was seen for a follow-up;  Dr. Finlay indicated Plaintiff was to take one or two Norco every four to six hours for pain, and not to exceed nine Norco per day. (AR 231.)

On March 19, 2007, Dr. Finlay ordered an MRI of Plaintiff's lumbar spine (AR 234), which was obtained on April 16, 2007 (AR 270-71).   The radiologist interpreting the MRI reported the following impression:

> Combination of bulging disk, posterior spurs and hypertrophic ligamentum flavum is causing moderate degree of spinal stenosis at L3-4 with moderate narrowing of the left L3-4 neural foramen, more than on the right side.  Appearance has not changed from 10/04/2005.

(AR 271.)

On October 3, 2007, Plaintiff was examined by Maria Antonio Depina, M.D.  (AR 235.) Dr. Depina noted that depression was the "primary encounter diagnosis," and that Plaintiff would continue on Zoloft.  (AR 235.)  Dr. Depina also noted Plaintiff had chronic pain syndrome; she prescribed Nabumetone and decreased Plaintiff's prescribed dosage of Norco.  (AR 235.)  Finally,

1   Plaintiff was noted to have a peripheral nervous system disorder that was characterized as "stable."

2   (AR 235.)

3        On October 17, 2008, treatment notes reflect that Plaintiff was examined and her

4   medication was refilled.  (AR 240-42.)  The physician noted that Plaintiff reported taking two to

5   three Norco tablets daily, and he would "give her 75 every month.  She was prescribed 900 tablets

6   one year ago."  (AR 242.)

7        On November 1, 2008, a treatment note signed by Lwin Htun, M.D., indicates Plaintiff

8   reported taking only two Norco per day, three at the most.  (AR 244.)  Dr. Htun indicated that, as

9   of October 31, 2008, Plaintiff was to take 1 tablet of Norco every 8 to 12 hours as needed, but she

10  should not exceed three tablets in a 24-hour period.  (AR 243.)

11       On November 5, 2008, Plaintiff was seen by Dilip Banerjee, M.D., for "vague non

12  descript" chest pain.  (AR 245.)  He indicated she would return to the office in a month for a

13  cardiolite test, and would continue to follow her present medication routine.  (AR 246.)  Dr.

14  Banerjee also noted "[s]ignificant discussion took place about abstinence from smoking."

15  (AR 246.)  On November 20, 2008, Plaintiff underwent the cardiolite test ordered by Dr. Banerjee,

16  which resulted in a "[n]ormal pharmacologic stress test."  (AR 246-47.)

17       On February 3, 2009, Plaintiff was referred to Robert Eaton Lefevre, M.D., for chronic

18  back pain and neuropathy.  (AR 247.)  Plaintiff reported a 20-year history of pain, worse with

19  standing and lifting; she had undergone three epidurals eight years prior that had not helped; she

20  had fibromyalgia; she suffered a work-place injury 15 years ago; she had experienced headaches

21  in the previous month and a half; she experienced numbness from her knees down and could not

22  get her legs and feet warm; and she suffered from fatigue and grogginess.  (AR 247-48.)  On

23  examination, Dr. Lefevre noted she exhibited no edema, but she had multiple tender points on her

24  neck, sternum, lower back, and elbows.  (AR 249.)  He gave an impression of chronic pain

25  syndrome for which he prescribed hydrocodone-acetaminophen; and peripheral neuropathy, for

26  which he indicated Plaintiff could increase her prescription of Norco, and if there were side

27  effects, she could try Oxycontin or a duragesic patch.  (AR 249.)  Plaintiff elected to increase her

28  prescription of Norco, and Dr. Lefevre prescribed a maximum dose of 10 tablets per day.

1  (AR 249.)

2      On July 27, 2009, Plaintiff was examined by Dr. Htun.  (AR 251.)  Plaintiff reported a

3  headache for the prior three weeks associated with numbness in her arm and hand as well as

4  dizziness.  (AR 251.)  Plaintiff had also experienced an increase in her neck pain and chills during

5  hot days.  (AR 251.)  Her headaches were noted to be "likely due to viral infection."  (AR 253.)

6      On November 18, 2009, Plaintiff underwent a comprehensive internal medicine evaluation

7  by Manmeet Shergill, M.D.  (AR 285-90.)  Plaintiff's chief complaints included fibromyalgia,

8  lower back pain, and heart disease.  (AR 285.)  Plaintiff reported she was first diagnosed with

9  fibromyalgia 12 years prior to the examination; the pain is intense all over her body.  (AR 286.)

10  She has good days when she is able to groom herself well, change her clothes, and go shopping;

11  then she will have bad days where she is unable to do anything.  (AR 286.)  As to her lower back,

12  Plaintiff explained that it had gradually worsened over time, she had been given anti-inflammatory

13  medication, and then underwent an MRI which showed a bulging disc and degenerative changes.

14  She was not prescribed surgery or referred for orthopedic evaluation, but she was considered for

15  medical management and she had been taking pain medication.  The pain is located in her lower

16  lumbar spine with no radiation.  It worsens when she walks for a long period of time.  (AR 286.)

17      Plaintiff reported her heart problems started in 2006 and since then she has been "good."

18  Dr. Shergill noted that Plaintiff was "very vague and a very poor historian as far as her symptoms

19  are concerned.  She frequently directs into some other stories."  (AR 286.)  He also noted that the

20  impact of her conditions on her activities of daily living was "[e]ssentially nothing.  She can

21  groom herself, do housework, do yard work, cook for herself, and do vacuuming.  However, she

22  does take breaks while she does the house and yard work."  (AR 286.)

23      On examination, Dr. Shergill noted diffuse tenderness to palpation of the lower lumbar

24  spine and lower thoracic spine.  Plaintiff complained of pain to the touch without significant

25  pressure in her shoulders, neck, intrascapular region, upper arms, bilateral hips, thighs, and lower

26  leg. Plaintiff also reported continued pain with mild touch of the skin, generally.  (AR 289.)  Dr.

27  Shergill diagnosed lower back pain, a history of coronary artery disease, and a history of

28  hypothyroidism,  depression,  gastroesophageal  reflux  disease,  allergic  rhinitis,  and

1  hypercholesterolemia.  (AR 289.)  Dr. Shergill provided a functional assessment of Plaintiff,

2  opining that she could stand and walk up to six hours in a day with no limitation on her ability to

3  sit; she needed no assistive devices; she could lift and carry 20 pounds occasionally, and 10

4  pounds frequently; she could make postural and manipulative motions on a frequent basis; and she

5  had no environmental limitations.  (AR 289.)

6      On December 14, 2009, state agency physician Matthew C. Gleason, M.D., reviewed

7  Plaintiff's records and opined that she would be able to perform light work with postural

8  limitations.  (AR 298.)  Dr. Gleason noted that, although Dr. Shergill found Plaintiff would be able

9  to make postural motions on a frequent basis, given Plaintiff's MRI and her complaints of pain,

10 only occasional postural motions would be reasonable.  (AR 298.)  Dr. Gleason also indicated that

11 Plaintiff's obesity would further aggravate her back pain.  (AR 298.)

12      On December 19, 2009, Plaintiff underwent a comprehensive psychiatric evaluation with

13 Christopher Sanders, Ph.D.  (AR 300-04.)  Plaintiff's chief complaint was depression.  (AR 300.)

14 She indicated she began experiencing pain as a result of fibromyalgia in 1992 with increased pain

15 over time.  Her mood began to fluctuate with her pain level.  (AR 300.)  She reported suicidal

16 ideation, but she had no plan or intent.  (AR 300.)  On examination, Dr. Sanders assigned Plaintiff

17 a Global Assessment of Functioning ("GAF") score of 65,[2] and indicated that she was

18 experiencing depression related to her physical pain.  (AR 303.)  She was noted to be compliant

19 with her psychiatric medications and other medications and reported that her mood was improved.

20 Dr. Sanders listed her prognosis for continued improvement within the next year as good.

21 (AR 303.)  He opined that Plaintiff had a very good ability to understand and remember short and

22 simple instructions; a good ability to understand and remember detailed instructions, maintain

23 concentration and attention; she would be able to accept instructions from a supervisor and

24

---

25 [2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am.
   Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of

26 zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental
   health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A

27 GAF score between 61 and 70 indicates mild symptoms or some difficulty in social, occupational, or school
   functioning but generally functioning pretty well.  *Id.*

28

respond appropriately; she would be able to complete a normal workday/workweek without interruptions; she would be able to effectively interact with co-workers; she would be able to deal with various changes in a work setting; and the likelihood she would emotionally deteriorate in the work environment was low.  (AR 304.)

On January 21, 2010, state agency psychiatrist P. Davis reviewed Plaintiff's medical records and indicated that Plaintiff had a nonsevere affective disorder that caused only mild limitations.  (AR 305-17.)

On January 26, 2010, Plaintiff was seen by Donna Anne Kalauokalani, M.D., who was filling in for Plaintiff's primary care physician, Dr. Lefevre.  (AR 349.)  Plaintiff complained of her fibromyalgia pain, and reported that her pain had significantly limited her ability to go to work, perform household chores, do yard work or shopping, socialize with friends, participate in recreation, physical exercise, driving, or caring for herself.  (AR 349.)  She reported that she can walk only one block before having to stop due to pain; she can sit for about five minutes before having to get up and move; she can stand for about 10 minutes before having to sit down; and she often has to lie down during the day because of pain.  (AR 349.)  Dr. Kalauokalani provided the following assessment:

> We had an extensive discussion regarding the importance of physical therapy in her ongoing rehabilitation and the importance of engaging in a regular home exercise program that incorporated specific exercises tailored for her by physical therapy. She would benefit from a physical therapy evaluation, and engaging in online educational resources.
>
> In terms of medications, I would recommend no changes at this time.  I have stressed the recommendation to limit her use of Norco to 3 tabs each day and utilize to facilitate enhanced activity, i.e., [g]oing shopping, or exercise.  Her next refill should not be due until end of Feb and she generally gets [a] 3[-]month supply to reduce copay.  Consideration should be given to the addition of a TCA of gabapentin to address her largely neuropathic symptoms.
>
> Medication Agreement and Opioid informed consent:  not done today but may be appropriate in the future.  We discussed the risks and benefits of continued use of opioid analgesia.
>
> There appears to be the need for further evaluation.  Consideration may be given to the following:

1
          -Rheumatology consult to verify dx of fibromyalgia syndrome and screening labs for other rheumatologic illness.

2

3
          -Recheck TSH as trend for last 2 (between 10/07 and 7/09) have shown increasing trend.

4
          -Patient advised to get ophthalmology exam since complaints of right eye visual issues since her MI in 2006.

5

6
          -Given the presence of coexisting neurovegetative symptoms, I anticipate she would benefit from referral to mental health.  PHQ 9=18.

7

8
(AR 352-53.)

9
     On February 4, 10, 24, and 26, 2010, Plaintiff attended chronic pain management sessions

10
with Pamela Van Allen, a psychologist.  (AR 357-58, 364, 368.)

11
     On April 20, 2010, Plaintiff was seen by a registered nurse and reported pain.  (AR 369-

12
72.)  Plaintiff indicated the Norco medication did not help as much as it had in the past, and she

13
was experiencing grogginess and sleepiness from her medications.  (AR 371.)  The recommended

14
treatment plan included physical therapy and that Plaintiff continue her current medication regime

15
and follow-up in one month.  (AR 372.)

16
     On May 25, 2010, Plaintiff followed-up with Dr. Van Allen for a psychological

17
assessment.  (AR 381-84.)   Plaintiff reported depressed mood, anhedonia, appetite change,

18
insomnia, decreased concentration, and pain with gastrointestinal distress.  (AR 382.)  Dr. Van

19
Allen listed a diagnosis of depression and characterized Plaintiff's level of distress as 6 out of 10,

20
with 10 being maximum.  (AR 382.)  Plaintiff appeared "not pulled together," she exhibited

21
psychomotor agitation, she was hyperverbal, irritable, but her thought process was logical and her

22
thought content was normal.  (AR 382-83.)  Plaintiff was fully oriented, exhibited normal attention

23
and concentration, her memory was intact, her impulse control was good, and her insight and

24
judgment were fair.  (AR 383.)   Upon evaluation, Dr. Van Allen noted that Plaintiff frequently

25
"uses denial as a defense," and indicated this would make brief therapy challenging.  (AR 383.)

26
She also reported Plaintiff had a difficult communication style which was part of her defensive

27
structure to prevent her from hearing something that might be threatening.  (AR 383.)  Because of

28
this communication style, Dr. Van Allen indicated she was unable to complete or structure the

interview adequately to definitively diagnose Major Depression, so she listed a working diagnosis of depression, not otherwise specified.  (AR 383.)

Also in May 2010, Plaintiff was referred to Win Minn Lim, M.D., for possible rheumatoid arthritis.  (AR 376.)  Plaintiff reported pain in her wrist, elbow, shoulder, knee, hips, and ankles; she described the pain as moderate sharp numbness and aching constantly that increased with activities.  (AR 376.)  She reported that Norco decreased her pain, and that her symptoms were worse in the morning and at night.  (AR 376.)  Upon examination, Dr. Lim noted there was "no joint tenderness, deformity or swelling, full range of motion without pain + tenderpoints." (AR 378.)  He diagnosed Plaintiff with chronic pain syndrome, and they discussed the importance of regular exercise and sleep.  (AR 380.)  Plaintiff was also given instructions for stretching. (AR 380.)

On June 15, 2010, Plaintiff was seen by a nurse at Kaiser Permanente and requested to discuss which of her medications may be causing her to feel sleepy.  (AR 392.)  Plaintiff also reported some back pain which she attempted to relieve by stretching.  (AR 392.)  In terms of exercise, Plaintiff indicated she tried to do something every day, including stretching in the morning and sometimes at night.  (AR 392.)  She used to love to garden but she "often overdoes it."  (AR 392.)  She reported taking her dog out for walks.  (AR 392.)  Plaintiff reported waking frequently due to pain a few times a week, and that she naps in the afternoon.  (AR 392.)  Some days she sleeps all day.  She takes Temazepam to help her fall asleep, but sometimes it does not help.  (AR 392.)

On July 27, 2010, Plaintiff again saw the nurse and reported having some nausea and feeling faint, which she thought was related to her Effexor medication.  (AR 400.)  She felt her balance and coordination were not as good recently, and she noticed she was sweating a lot more that summer.  (AR 400.)  On August 19, 2010, Plaintiff again reported nausea and faintness, and the nurse indicated these symptoms could be caused by the medication Effexor.  (AR 411.)

On June 23, 2011, Kaiser Permanente treating records indicate Plaintiff was seen for a headache, light-headedness, and near syncope.  (AR 420-21.)  Dr. Htun could not rule out stroke, and they discussed stroke prevention.  (AR 422.)  Dr. Htun diagnosed hyperlipidemia, headache,

chronic pain syndrome, peripheral neuropathy in her leg, and suggested that Plaintiff ask for a cardiology follow up.  (AR 422.)

On July 25, 2011, Plaintiff was seen by Dr. Htun for joint pain in her hip and leg that had been affecting Plaintiff for a week.  (AR 431.)  She could not walk due to pain, but she could "transfer." (AR 431.)  Dr. Htun prescribed prednisone for her leg pain and ordered an MRI. (AR 432.)

On July 27, 2011, Plaintiff again saw Dr. Htun and reported that her back pain was better, but her leg pain was not.  On the same day, Plaintiff underwent an MRI of her lumbar spine.  (AR 461-62.)  The radiologist reported the following impression:

1.    Marked L3-4 and mild L2-3 and L4-3 disc degeneration.  The multilevel disc and marked facet joint degeneration results in at most mild thecal sac compression.

2.    The right lateral recess is narrowed at L3-4 and L4-5, potentially affecting the L4-L5 nerves respectively.

3.    Moderate right L3-4 and L4-5 and at least moderate left L3-4 neural foraminal narrowing.

(AR 461-62.)

On August 1, 2011, Plaintiff was referred to Edgar Hse-Hwa Han, D.O., for her lower back pain.  (AR 438.)  Dr. Han recommended a long-acting opiate medication for the time being, as her pain was reported to be unbearable and limited her functioning.  (AR 444.)  He also recommended an epidural injection, superficial heat/ice, and gave her a handout outlining a home exercise program.  (AR 444.)

**B.      Lay Testimony**

On October 25, 2009, Plaintiff completed a function report.  (AR 159-66.)  Plaintiff described her daily activities as follows:  when she wakes, it takes time for her body to function; she lets the dogs out and eats something so that she can take her medication; she feeds and waters the dogs, and then lies down, sometimes sleeping for a bit; if she has to go out, she will wash her hair and get dressed, but if she is in a lot of pain, she normally will not get dressed; she tries to perform some household chores such as laundry or sweeping, but that usually causes pain and she

will then lie down again or watch television; she prepares lunch, and depending on her condition, she may lie down again or try to do something; she will then prepare dinner, feed her dogs, take her medication, and get ready for bed.  (AR 159.)

Her dogs are five pounds each, and she feeds, baths, and plays with them.  (AR 160.) However, her daughter helps her when she is unable to do things, such as care for her dogs or herself.  (AR 160.)  She used to be able to clean the house, care for her backyard, and show her dogs; now these things are very difficult.  (AR 160.)  She has breathing problems, pain in her back and legs, and her arms go numb; the pain affects her ability to sleep.  (AR 160.)

Due to numbness and pain in her arms, it is difficult to do her hair because that requires repetitive arm lifting.  (AR 160.)  She prepares some meals limited to "quick and easy" things such as frozen dinners, sandwiches, and vegetables.  (AR 161.)  She does not perform any yard work, and does her household chores a little at a time.  (AR 161.)  When she mops, she has problems moving for days afterwards and if she could afford it, she would have help with some of the household chores.  (AR 161.)  She is able to drive a vehicle, but she will not go very far as she has to stop and get out due to pain in her back and legs.  (AR 162.)

Her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, use her hands, complete tasks, concentrate, and retain memories.  (AR 164.)  She does not lift anything over ten pounds usually because it makes her back pain worse.  (AR 164.)  She cannot stand or sit for very long because of pain and trouble getting up from a seated position. (AR 164.)  Any repetitive use of her hands causes pain.  (AR 164.)  She can walk for a total of five to ten minutes; her attention span is shorter than in the past; and she sometimes has difficulty remembering spoken instructions.  (AR 164.)

She does not handle stress very well at times, but she is "okay" handling changes in routine; she has a fear of falling, having a heart attack, or dying and that her dogs will be left with no one to care for them.  (AR 165.)

Finally, she is on a lot of medication that sometimes makes her groggy.  She will reschedule her day if she is too groggy, and then she will just lie down.  (AR 166.)  She also has neck problems and a spastic colon that sometimes requires frequent trips to the bathroom.

(AR 166.)  She has a solid prior work history and would go back to work if she could.  However, with a combination of grogginess from multiple medications, fibromyalgia, problems with her back, not being able to stand or sit for a long period of time, leg pain, heart problems with some permanent damage in the lower part of her heart, colon problems, and high blood pressure, she is unable to hold a job.   (AR 166.)

**C.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 66, 79-84, 85-86.)  On June 9, 2011, the ALJ held a hearing.  Plaintiff testified, through the assistance of counsel.  (AR 28-65.)

**1.      Plaintiff's Hearing Testimony**

Plaintiff was born on February 2, 1948; she lives alone in a house.  (AR 33-34.)  Her daughters help her with things around her house that she cannot do.  (AR 34.)  She has a driver's license and she is able to drive two to three times per week, and can drive for approximately one hour without stopping.  (AR 35.)  Her physical problems have been worsening in the last couple years. (AR 35.)

She completed a bachelor's degree in sociology, and worked as a family service specialist, until her heart attack in 2006 when she did not return to work.  (AR 35-36.)  That job required her to sit for an extended period of time, type at a computer, and stand to perform the training.  (AR 36.)  She sat for approximately six hours a day and was on her feet about three hours a day.  (AR 43.)  Some days, however, required more time on her feet because she was involved in assessment testing.  When she was performing those tasks, she was on her feet approximately six hours per day.  (AR 43.)  On an average month she was generally sitting more than she was required to stand.  (AR 44.)   The job also required her to concentrate, understand and interpret federal and local regulations, and talk with clients.  (AR 36.)  Now, however, she is unable to remember technical things like she used to, and she has a problem with understanding.  (AR 37.)

When she experienced her heart attack in 2006, she remained in the hospital for four or five days, and followed up with a cardiologist.  (AR 40.)  Her doctor told her that she had damage

1   to the lower part of her heart, but she could not recall whether he made any recommendations

2   about working after the heart attack.  (AR 40.)  Following her heart attack she did not look for

3   other work; she collected California State Disability Benefits.  (AR 41.)

4          Aside from her heart condition, she has fibromyalgia, but it has been twelve years since

5   she has received medical treatment for that condition, even though it is worsening.  (AR 45.)  Her

6   hands go numb more quickly than they used to, and she can only use her hands for typing or

7   grasping for approximately five minutes before needing to rest.  (AR 46.)  If she lifts more than

8   ten pounds, she has severe back pain for a period of time.  (AR 46.)  The most she can be on her

9   feet at one time is twenty or thirty minutes without severe pain.  (AR 46.)  To relieve the pain, she

10  performs stretching exercises, applies heat, lies down between tasks, and she attended some pain

11  management classes.  (AR 47.)

12         She experiences adverse side effects from her medication including fatigue and sleepiness.

13  (AR 47.)  Conversely, she experiences insomnia at night due to pain.  (AR 47-48.)  As a result, she

14  has trouble getting to sleep and then is drowsy during the day.  (AR 49.)  The medication also

15  causes concentration and memory problems.  (AR 48.)

16         As it pertains to her back, there is a disintegrating disc and something that is closing in on

17  the nerves.  (AR 49.)  She has discussed this with her doctor, and a number of years ago surgery

18  was recommended, but her most recent insurer, Kaiser, does not "seem enthusiastic about it."

19  (AR 49.)  She also experiences chest pain, along with shortness of breath and fatigue, which her

20  doctor attributes to her heart condition.  (AR 50.)

21         Plaintiff takes an over-the-counter medication for her spastic colon most of the time, and

22  she also takes prescription strength medication once a week.  (AR 51.)  She must use the restroom

23  four to five times a day during a span of eight hours, and she requires the use of the facilities for

24  twenty to twenty-five minutes when she is experiencing problems.  (AR 52.)  She experiences

25  these problems about six days per month.  Plaintiff has suffered with this condition for twenty

26  years.  (AR 53.)  However, it has worsened with time, despite that she worked around the problem

27  in the past.  (AR 53.)

28

She believes she cannot return to her former job primarily because of the pain she suffers in her arms, neck, and back.  (AR 56.)   Her pain is concentrated in her lower back.   She experiences numbness in her arms, legs, and hips.  (AR 57.)  She believes the numbness and pain are caused by fibromyalgia.  (AR 58.)  She also believes she is unable to work because of sleepiness and fatigue, and because a "job requires concentration and [] the ability to understand a lot of technical things and do assessments," which she feels she is now unable to do.  (AR 58.)

**2.      The ALJ's Decision**

On October 13, 2011, the ALJ issued a decision finding Plaintiff not disabled.  (AR 14-23.) Specifically, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since January 20, 2006, the date of alleged onset; (2) has the following medically severe combination of impairments:  fibromyalgia, obesity, status post myocardial infarction and stent placement, history of coronary artery disease, hypertension, hypothyroidism, degenerative disc disease of the lumbar spine, peripheral nervous system disorder, and gastroesophageal reflux disease; (3) does not have an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) has the residual functional capacity ("RFC")[3] to perform light work with only occasional postural activities like climbing of ramps, stairs, ladders, ropes, scaffolds, and can perform only occasional stooping, kneeling, crawling, crouching, and balancing; and (5) Plaintiff is capable of performing her past relevant work as an Employment Training Specialist or as a vocational counselor.  (AR 14-23.)

**3.      Plaintiff's Appeal of the ALJ's Decision**

Plaintiff sought review of the ALJ's decision before the Appeals Council.  (AR 13-14.)  On June 7, 2012, the Appeals Council denied review.   (AR 1-8.)   Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.[1]  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1    On   December 7, 2012, Plaintiff filed a complaint in this Court seeking judicial review of

2  the ALJ's decision.  Plaintiff contends that the ALJ improperly considered her credibility, the lay

3  testimony offered by a third-party witness, and improperly evaluated the medical evidence.

4                                    **SCOPE OF REVIEW**

5    The ALJ's decision denying benefits "will be disturbed only if that decision is not

6  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

7  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

8  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

9  Instead, the Court must determine whether the Commissioner applied the proper legal standards

10 and whether substantial evidence exists in the record to support the Commissioner's findings.  See

11 *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

12 scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

13 Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

14 accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

15 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

16 consider the entire record as a whole, weighing both the evidence that supports and the evidence

17 that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

18 specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

19 2007) (citation and internal quotation marks omitted).

20                                    **APPLICABLE LAW**

21    An individual is considered disabled for purposes of disability benefits if he or she is

22 unable to engage in any substantial, gainful activity by reason of any medically determinable

23 physical or mental impairment that can be expected to result in death or that has lasted, or can be

24 expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

25 §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The

26 impairment or impairments must result from anatomical, physiological, or psychological

27 abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

28 techniques and must be of such severity that the claimant is not only unable to do her previous

1  work, but cannot, considering her age, education, and work experience, engage in any other kind

2  of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3),

3  1382c(a)(3)(B), (D).

4      The regulations provide that the ALJ must undertake a specific five-step sequential

5  analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

6  whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§

7  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

8  has a severe impairment or a combination of impairments significantly limiting her from

9  performing basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ

10  must determine whether the claimant has a severe impairment or combination of impairments that

11  meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart

12  P, App. 1.  *Id*. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine

13  whether the claimant has sufficient residual functional capacity despite the impairment or various

14  limitations to perform her past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in Step Five, the

15  burden shifts to the Commissioner to show that the claimant can perform other work that exists in

16  significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).  If a claimant is

17  found to be disabled or not disabled at any step in the sequence, there is no need to consider

18  subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

19  404.1520, 416.920.

20                              **DISCUSSION**

21  **A.      The ALJ Failed to State Clear and Convincing Reasons to Reject Plaintiff's**
22  **        Credibility**

23      Plaintiff argues the ALJ erred in assessing her credibility.  In evaluating the credibility of a

24  claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.

25  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the

26  claimant has presented objective medical evidence of an underlying impairment that could

27  reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  The claimant is not

28  required to show that her impairment "could reasonably be expected to cause the severity of the

symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### 1. Inconsistent Statements

Plaintiff asserts she consistently complained of disabling pain and fatigue, and the ALJ erred by failing to articulate clear and convincing reasons for not crediting her testimony in this regard. (Doc. 16, 15:20-21.) The ALJ found Plaintiff not fully credible due to a pattern of inconsistent statements including the amount of narcotic pain medication she takes on a daily basis. Plaintiff asserts that the ALJ failed to cite any specific evidence in support of this finding, and any characterization of Plaintiff's statements about her medication as being inconsistent is inaccurate because her dosages were changed frequently by her physicians. Thus, the fact that Plaintiff reported that she took differing amounts of medication at different times does not make her testimony inconsistent.

The Commissioner contends the ALJ properly noted that Plaintiff admitted taking up to 9 Norco tablets per day, but that in November 2008, she reported taking only 2 to 3 Norco tablets

1   per day.  (Doc. 17, 18:11-14.)  The Commissioner notes that, while Plaintiff argues her physicians

2   adjusted her medication over time, "there is no evidence that any inconsistency 'was the result of'

3   physicians['] orders.'"   (Doc. 17, 18:14-16.)   The Commissioner highlights that Dr. Finlay

4   authorized up to 10 tablets of Norco per day, but he also noted that because Plaintiff was taking

5   such a small amount of Norco, she had elected to continue with this medication rather than try a

6   different type.  (Doc. 17, 18:16-18 (citing AR 249, 252).)  Moreover, Dr. Kalauokalani noted that

7   Plaintiff should limit her Norco use except when engaged in an "enhanced activity."   The

8   Commissioner argues this evidence establishes inconsistencies about how much medication

9   Plaintiff required, and while this could be read to suggest that Plaintiff's needs varied over time,

10  the ALJ was entitled to interpret Plaintiff's statements about her medication as inconsistent.

11      The ALJ reasoned that it was emphasized in November 2008 by a treating physician that

12  Plaintiff was only to take 1 Norco tablet every 8 to 12 hours (2 to 3 per day), and not to exceed 3

13  tablets for a 24 hour period.  (AR 19.)  The ALJ noted Plaintiff reported she was compliant with

14  this by taking only 2 to 3 Norco per day, but the ALJ also indicated that she had admitted taking

15  up to 9 tablets a day, which the ALJ interpreted as "contrary" to her "claims of only taking 2-3

16  tablets a day."  (AR 19.)

17      Despite the Commissioner's argument, when viewing the record as a whole, it is not

18  susceptible to the interpretation offered by the ALJ with respect to Plaintiff's statements about her

19  medication.  On January 14, 2007, Plaintiff reported to Dr. Hansrote that she usually took 3 to 4

20  Norco per day, but at times she had taken up to 9 a day in the year after her heart attack and prior

21  to the examination.  (AR 227.)  At a follow-up appointment on January 25, 2007, Dr. Finlay

22  prescribed up to 9 Norco per day.  (AR 231.)  Dr. Finlay again prescribed up to 9 Norco per day in

23  March 2007.  (AR 234.)  In October 2007, it was noted that Plaintiff's prescription for Norco was

24  decreased, and she was given a prescription for Nabumetone, an anti-inflammatory medication

25  prescribed to reduce pain and inflammation.  (AR 235.)  A year later, in October 2008, Plaintiff

26  reported that she was taking 2 to 3 tablets of Norco (hydrocodone) daily, and the physician

27  prescribed 75 Norco per month (2.5 per tablets day), noting that she had been prescribed the same

28  amount (900 yearly pills) one year ago, referencing the decrease in Norco in October 2007.

1   (AR 242.)   Her prescription was again increased by July 2009, as Dr. Htun prescribed 1 to 2

2   tablets of Norco every 4 to 6 hours, and noted Plaintiff should not take more than 10 tablets daily.

3   (AR 252.)

4         The fact that Plaintiff reported taking up to 9 Norco daily at times between 2006 and 2007

5   is not inconsistent with her statement that she was taking 2 to 3 Norco per day at the end of

6   October 2008, particularly as that was the amount she was prescribed at that time, i.e., the

7   reduction of her prescription for Norco in October 2007 matches the report she provided in

8   October 2008.   These statements were all made to treating physicians, who were actively

9   monitoring and adjusting Plaintiff's prescriptions.   It is not the case that Plaintiff told her

10  physicians she was compliant with her medication at 2 to 3 Norco tablets per day in October 2008,

11  but then contemporaneously reported elsewhere that she was taking up to 9 Norco tablets a day in

12  an effort to exaggerate the amount of pain she was suffering.   Moreover, the fact that Plaintiff

13  reported taking different amounts of Norco on two occasions nearly two years apart (compare

14  January 2007 with October 2008) is not only consistent with the prescribed dosages as reflected by

15  the treatment notes, but also indicates that Plaintiff's prescribed dosage changed over time, not that

16  she was inconsistently reporting her usage.   Reviewing the record as a whole, the evidence is not

17  reasonably susceptible to an interpretation that Plaintiff's reporting was inconsistent regarding her

18  medication such that it constitutes a clear and convincing basis to discount her credibility.

19        As it pertains to general inconsistencies in Plaintiff's statements regarding her

20  symptomatology, the ALJ discussed various disability reports Plaintiff submitted describing her

21  limitations and activities.[4]   Plaintiff's original Adult Disability Report stated that her heart attack,

22  fibromyalgia, chronic pain in her neck, back, and legs, colon spasms, arthritis, degenerative discs,

23  and depression were all impairments that precluded her from working beginning January 20, 2006.

24  (AR 159-66.)   In a subsequent disability report submitted in September 2009, Plaintiff explained

25

26  [4] The ALJ did not expressly conclude that Plaintiff's disability reports were inconsistent with her hearing testimony
regarding the extent of her limitations, and did not list inconsistent statements in her disability reports as a reason for
27  discrediting Plaintiff's testimony.  Rather, the ALJ stated that Plaintiff was found not fully credible due to "a pattern of
inconsistent statements including the amount of narcotic pain medication she takes on a daily basis."  (AR 18.)  To the
28  extent that the ALJ considered Plaintiff's disability reports as containing inconsistent statements and a basis to reject
Plaintiff's hearing testimony, as discussed below, the ALJ mischaracterized the content of Plaintiff's disability reports.

1   that she took a lot of medication; could not sit or stand for very long, and if she does, she

2   experiences excruciating pain; her arms go numb if she holds the mouse at her computer for very

3   long; she has a spastic colon; she experiences terrible headaches; she has cramps in her legs; she

4   has sleeping problems because of the pain; a memory problem; and she is tired all the time.

5   (AR 142.)

6       In March 2010, Plaintiff submitted another disability report stating that her impairments

7   had no effect on her ability to care for her own personal needs and that there was *no change* in her

8   daily activities since she last completed a disability report.  (AR 175.)  In August 2010, Plaintiff

9   submitted yet another disability report admitting that her impairments had no effect on her ability

10  to care for her own personal needs and that there was *no change* in her daily activities since she

11  had submitted her previous report.  (AR 182.)  The ALJ mischaracterized her statement regarding

12  her daily activities to be that there was "no effect upon her ability to care for her personal needs or

13  upon her activities of daily living."  (AR 18.)  Plaintiff did not state that her impairments had no

14  effect upon her activities of daily living; rather, she indicated in each disability report that there

15  had been *no change* in her daily activities since her last report.  (AR 182.)[5]  To the extent that the

16  ALJ considered this as an inconsistency in Plaintiff's statements regarding how her impairments

17  limited her daily activities, the Court finds no such inconsistency sufficient to discredit her

18  testimony regarding the extent of her subjective symptomatology and limitation.

19      **2.    Vague or Insufficient Reporting**

20      The ALJ also rejected Plaintiff's credibility due to "instances of providing vague or

21  insufficient information."    (AR 18.)    Plaintiff asserts this reasoning lacks explanation and

22  specificity to be considered a clear and convincing basis to reject her credibility.  Moreover, any

23  "vagueness" on Plaintiff's part is consistent with her complaints that she felt confused, no longer

24  "sharp," fatigued, and drowsy.

25  
26  
27  
28  

[5] Dr. Shergill reported Plaintiff's conditions had essentially no impact on her activities of daily living (AR 286), which the ALJ noted in describing Dr. Shergill's examination report (AR 20.)  To the extent that this report was inconsistent with other lay testimony, the ALJ discussed only the perceived inconsistency between Plaintiff's various disability reports with regard to their daily activities.  Of course, Dr. Shergill's examination report also indicated that Plaintiff reported both good days, where she could do most activities, and bad days when "she is not able to do anything." (AR 286.)  The notation that Plaintiff did not describe any effect on her activities of daily living is not actually consistent with the other reports Plaintiff made that were noted during the course of the examination.

The Commissioner contends the ALJ properly cited instances of Plaintiff's vague and insufficient reporting; the ALJ noted, for example, that Plaintiff reported for a gallbladder examination in June 2007 complaining of abdominal pain and bloating, but the testing yielded "unremarkable" findings (AR 202-04); further, after complaining of shortness of breath and chest pain, test results showed normal findings (AR 246-47).  (Doc. 17, 18:27-19:3.)  While these examples were not contained within the credibility discussion of the ALJ's decision, the Commissioner contends they are examples of vague information that was inconsistent with the medical evidence and discussed by the ALJ in other portions of the decision.

The two examples cited by the Commissioner do not involve Plaintiff providing insufficient or vague information.  In these examples, Plaintiff merely presented for examination based on a particular symptomatology, but the test results returned "unremarkable" or normal findings.  (See AR 202-04 (tests unremarkable for gallbladder examination), 245-47 (normal pharmacologic stress test after complaints of shortness of breath and chest pain).)  These examples relate to whether objective medical testing explained Plaintiff's reported symptoms.  Rejecting Plaintiff's statements in this way would be equivalent to rejecting lay statements because they were not adequately corroborated by objective medical testing which, in and of itself, is an insufficient basis to discredit a claimant.  *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) ("once [a] claimant produces objective medical evidence of an underlying impairment, [the ALJ] may not reject [the] claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of the pain").

In short, none of the evidence discussed by the ALJ revealed instances of vagueness or insufficient information given by Plaintiff.  Although Plaintiff struggled to provide clear answers to some of the ALJ's questions during the course of the hearing, these instances were not discussed or even noted by the ALJ.[6]  The Court also notes that Dr. Shergill found Plaintiff to be "very

---

[6] At the hearing, Plaintiff gave the following testimony in response to the ALJ's questions:
Q [ALJ:]  When was the heart attack?  What was the exact date?
A [Plaintiff:]  In '06.
Q  What was the date?
A  I'm sorry, I don't remember.
Q  This was a life shaping event, was it not?
A  Yes.

vague and a very poor historian as far as her symptoms are concerned.  She frequently directs into some other stories."   (AR 286.)    While this does appear to demonstrate some vague and insufficient reporting of symptoms, again, this evidence was neither discussed nor even referenced in the ALJ's decision.  Without any specific examples of vagueness or insufficient responses that are discussed or cited somewhere within the ALJ's decision, the ALJ's reasoning lacks specificity such that this cannot be considered a clear and convincing basis to discredit Plaintiff.  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).

### 3.    Daily Activities

The Commissioner also asserts the ALJ properly discounted Plaintiff's testimony regarding the severity of her pain and fatigue due to the extent of her daily activities.  The ALJ did not expressly state that the extent of Plaintiff's daily activities was a factor in the credibility determination.  Rather, the ALJ reasoned that Plaintiff was not credible "due to a pattern of inconsistent statements . . . as well as instances of providing vague or insufficient information." (AR 18.)  Nonetheless, the ALJ did note that Plaintiff was "able to do a wide range of activities of daily living."  (AR 18.)

Even considering this as a factor influencing the ALJ's credibility determination, however, it is not a clear and convincing reason to discredit Plaintiff's statements.  In *Fair v. Bowen*, the court held that "if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working."   885 F.2d 597, 603 (9th Cir. 1989).   Nonetheless, a claimant must "spend a substantial part of the day engaged" in such activities for the ALJ to have grounds for discounting the claimant's subjective pain testimony.  *Id.*   Further, the ALJ must make specific findings relating to the daily activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

---

Q But it was in '06 and that's as close as you can give me.  You don't remember the month that it occurred?
A  I thought it was January, I think, but I don't want to say for sure because of my (inaudible).
(AR 37.)

Here, Plaintiff reported living by herself and being able to prepare her own meals, attend to her own personal care, take care of her dogs, do some household tasks such as laundry or sweeping, use a computer, watch television, talk on the phone, drive, and shop up to 1- 1/2 hours a couple times per week.  (AR 159-66.)  These activities do not detract from Plaintiff's credibility, however.  While Plaintiff reported that she did the laundry, prepared meals, and went grocery shopping, she testified she performed these tasks infrequently – at most, a few times per week.  This type of limited activity does not bear a meaningful relationship to the activities of the workplace conducted on a daily 40-hour per week basis.  *Orn*, 495 F.3d at 639.  Moreover, as to household chores, Plaintiff testified at the hearing that when she cleaned the house, she would have to lie down after just three to four minutes of an activity like mopping, and then resume the activity after she had rested.  (AR 47.)  She also reported she only performs household chores once a week, and her meal preparation is limited to "easy and quick" things such as frozen dinners or sandwiches.  (AR 161.)  These are not the type of extensive daily activities that undercut Plaintiff's subjective reports of pain and limitation.

Finally, the ALJ did not make specific findings regarding Plaintiff's daily activities and their transferability to a particular type of job.  As such, even to the extent the ALJ considered Plaintiff's daily activities in the credibility calculus, they are not a clear and convincing basis to support an adverse credibility finding.

In sum, the ALJ's credibility finding is not predicated on clear and convincing reasons supported by substantial evidence.

**B.     The Extent of Plaintiff's Limitations Resulting from Fibromyalgia Was Not Properly Considered**

Plaintiff asserts that the ALJ failed to properly assess the limitations arising from her fibromyalgia, which the ALJ found to be a severe condition.  Plaintiff notes the ALJ relied on Dr. Shergill's opinion regarding Plaintiff's functional abilities, but Dr. Shergill did not diagnose fibromyalgia or list it as an impairment, despite that the ALJ considered it a severe impairment. Therefore, Plaintiff contends it appears that the ALJ did not properly assess the limitations arising from Plaintiff's fibromyalgia.

"Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms."  *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004).  Fibromyalgia's "symptoms are entirely subjective.  There are no laboratory tests for [its] presence or severity."  *Jordan v. Northup Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004).  Thus, when the severity or degree of limitation stemming from fibromyalgia and/or chronic pain syndrome is at issue, the claimant's credibility takes on particular significance.  *See Rogers v. Comm'r Soc. Sec. Admin.*, 486 F.3d 234, 248 (6th Cir. 2007) ("given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important").

Because assessment of Plaintiff's limitations regarding her fibromyalgia is inextricably intertwined with her subjective reports of pain and limitation, the flaws in the credibility finding permeate the assessment of Plaintiff's limitations stemming from her fibromyalgia.  In light of the error in the credibility analysis, it does not appear that Plaintiff's fibromyalgia limitations were adequately considered by the ALJ.  The ALJ should either state clear and convincing reasons why Plaintiff's statements regarding her pain and fatigue are not credible, or the ALJ should assess how Plaintiff's fatigue and pain limit her residual functional capacity.

**C.      The July 2011 MRI Results**

Plaintiff complains that the ALJ overlooked her July 2011 MRI, which Plaintiff maintains shows a worsening of her degenerative disc disease.  (*Compare* AR 271 *with* AR 461.)  Plaintiff is not a medical professional qualified to interpret radiology reports and determine whether they show a worsening of her lumbar condition, and the radiologist interpreting the 2011 results did not opine whether the findings indicated a worsening of Plaintiff's condition compared to the 2007 MRI results.

However, the July 2011 MRI was not discussed or referenced by the ALJ and it appears to have been overlooked or disregarded without comment.  In considering the degree of Plaintiff's reported pain and the limitations resulting therefrom, the MRI findings may impact the credibility

1  determination as it tends to support Plaintiff's reports of pain.  Therefore, the July 2011 MRI is

2  both significant and probative evidence the ALJ must consider.  *Vincent v. Heckler* 739 F.2d 1393,

3  1394-95 (9th Cir. 1984).  Additionally, because no physician provided an opinion regarding how

4  the 2011 MRI findings impacting Plaintiff's ability to function, the ALJ must consider whether this

5  MRI evidence renders the record ambiguous requiring further medical opinion evidence or

6  clarification.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence,

7  or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the

8  evidence, triggers the ALJ's duty to conduct an appropriate inquiry.") (internal quotation marks

9  and citation omitted).

10  **D.      Plaintiff's Remaining Arguments**

11          This case shall be remanded for renewed consideration of Plaintiff's credibility, the extent

12  of Plaintiff's limitation due to pain and fatigue resulting from her fibromyalgia, as well as

13  consideration of the July 2011 MRI findings which may require the ALJ to obtain further medical

14  evidence.  As such, the Court declines to address Plaintiff's remaining arguments regarding Dr.

15  Gleason's opinion and the lay testimony offered by a third-party as these issues are intertwined

16  with, and may potentially be mooted by, the issues that will be given renewed consideration on

17  remand.

18                                          **CONCLUSION**

19          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

20  substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for

21  further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter

22  judgment in favor of Plaintiff Sharon Gitthens and against Defendant Carolyn W. Colvin, Acting

23  Commissioner of Social Security.

24

25  IT IS SO ORDERED.

26      Dated:   __January 21, 2014__                    _____/s/ Sheila K. Oberto____
                                                         UNITED STATES MAGISTRATE JUDGE

27

28